BURGESS, Judge.
Gary Lavelle Maines filed this suit against his employer, H. G. Quinn, and the latter’s workmen’s compensation insurer, Home Insurance Company, seeking benefits for total and permanent disability allegedly resulting from injuries sustained by him during the course and scope of his employment, medical expenses, expert witness fees, and attorney’s fees and penalties for failure to continue workmen’s compensation payments after January, 1974. The lower court rendered judgment in favor of Maines and against defendants in solido for total and permanent disability benefits, medical expenses, expert witness fees and costs, but denied penalties and attorney’s fees. From this judgment defendants appeal. Since plaintiff has neither appealed nor answered the appeal the issue of attorney’s fees and penalties is not before us. We affirm the judgment of the lower court.
The factual basis of this proceeding arises out of an automobile accident that occurred on October 11, 1973, while plaintiff was employed in a seismographic crew by defendant Quinn. Plaintiff suffered numerous personal injuries in the accident. Prior to trial in the district court defendants stipulated plaintiff was engaged within the course and scope of his employment; however, defendants filed a motion for new trial on the basis of newly discovered evidence, contending that subsequent to the trial Maines filed a separate tort suit against the driver of the vehicle in which he was riding, claiming that he was not within the course and scope of his employment at the time of the accident in question. The court minutes reflect this motion was denied. Preliminarily, and prior to disposition of the merits on appeal, we find that since defendants stipulated before trial that plaintiff was in the course and scope of his employment when he was injured, the allegations made in a separate tort suit did not constitute newly discovered evidence which would warrant the granting of the motion for a new trial.
Defendants admitted that plaintiff was disabled within the meaning of the workmen’s compensation law of the State of Louisiana, until January, 1974, and they have paid workmen’s compensation benefits *322 through the first week of January, 1974. However, they contend that plaintiff had no compensable disability after that time. There is no dispute that plaintiff would be entitled to workmen’s compensation benefits at the rate of $65.00 per week if he is found to be totally and permanently disabled.
We have the benefit of the excellent written reasons of the trial judge in which he comprehensively detailed the injuries and medical reports and evaluations of all the treating and examining physicians. From our study of the transcript we conclude the trial judge’s reasons and judgment are amply supported by the record. Accordingly, we adopt his reasons as our opinion:
“Immediately after the automobile accident of October 11, 1973, plaintiff was confined to Winnfield General Hospital in Winnfield, Louisiana, during which time he was treated by Dr. John T. Mosley, a general practitioner. Dr. Mosley continued to treat plaintiff after his discharge from Winnfield General Hospital until January 11, 1974, at which time Dr. Mosley was of the opinion that plaintiff was able to return to work doing heavy manual labor without substantial pain. However, due to plaintiff’s complaints of headaches and dizziness, Dr. Mosley referred plaintiff to Dr. Frederick Boykin, a neurosurgeon of Shreveport, Louisiana.
“Dr. Mosley testified that as a result of the automobile accident, plaintiff sustained a concussion, together with a laceration of five to six inches in length over the left eye and chin, bruises and brush burns on the legs, an incomplete fracture of the right scapula, and fractures of both mandibles. Dr. Mosley' ref erred plaintiff to Dr. Bruce Phillips, an oral surgeon of Alexandria, Louisiana, for repair of the fractured mandibles.
“Under treatment by Dr. Phillips, the fracture of the mandibles were healed without significant complaint. However, during his visits to Dr. Phillips, plaintiff complained of pain in the lower back and Dr. Phillips referred him to Dr. Ray J. Buerlot, Jr., an orthopedic surgeon of Alexandria, for examination.
“The initial examination of plaintiff by Dr. Buerlot was on November 12, 1973, at which time plaintiff was complaining of pain to the right shoulder, with pain into the upper extremity to the elbow, pains in the left rib cage, pains in the left calf, pains in the low back and some pains in the left lower leg. Following this examination, Dr. Buerlot placed plaintiff on two kinds of oral medication, one of which was a muscle relaxant and the other an anti-inflammatory agent. He was instructed to return for further evaluation within two weeks but did not return until December 17, 1973.
“At the time of examination on December 17, 1973, Dr. Buerlot testified as follows :
“ ‘On December 17, he stated that his ribs and his shoulder were pain free. He was still complaining of some discomfort in his back. Another back examination was performed. The back examination at this time was essentially normal as far as his motion, sensation and reflexes and so forth. Measurements were essentially the same. Again, spot films were taken, where the previous avulsion factor was noted, and it was unchanged and there appeared to be some healing in the area. It was felt at this time that he was far enough along following his injury that he could start on very active range of motion, exercises, and was to return again in two to three weeks.’
“Plaintiff did not return to see Dr.' Buerlot following the appointment of December 17, 1973. Dr. Buerlot testified that he suggested at that time that plaintiff return to work, that he saw nothing that would prohibit plaintiff from carrying on his normal physical work activity, that plaintiff was showing an expected and; *323 usual recovery from his injuries and ‘that he was to the point that even though he was still having some complaints of soreness, that it was safe, medically, for him to begin active activities.’ Dr. Buerlot further testified that he did not find anything indicating permanent residual disability in this man as a result of his examination of December 17, 1973.
“During cross examination, Dr. Buerlot qualified his opinion as to his ability to return to work on December 17, 1973, by testifying as follows:
“ ‘I don’t think that he could do the heavier things that you mentioned, no. I think as he began to increase his activity within a few more weeks he probably or possibly would have been, and of course, this was the reason for the statement to return in two to three weeks to see how he was doing. He would have probably have some discomfort when he returned to work, at any stage. As any of us would when we start working muscles hard again that have been inactive over a period of eight to twelve weeks or what have you. And until he had restored all of his muscle tone, there would be some soreness and some difficulty in performing a full day’s work and all. But as he progressed, it would get easier and easier for him. I think he could ultimately, through exercise and activity, whether it be a program of exercises, weights or bending or exercises, or beginning to work back on his job, could restore himself back to full capacity.’
“Dr. Buerlot testified that in his opinion as of December 17, 1973, it would take from four to six weeks for plaintiff to be able to work pain free while doing the same duties and carrying out the same responsibilities that had been mentioned to him in connection with plaintiff’s job.
“Dr. Frederick Boykin examined plaintiff on January 16, 1974. At that time plaintiff’s chief complaints were severe headaches, dizziness, blurred vision in the left eye and numbness over a scar in the left temple. This examination was limited to neurological problems. On examination, Dr. Boykin found that the plaintiff had anesthesia for pain and light touch in the distribution of the left supraorbital nerve which is actually in the frontal area of the scalp. He also found that plaintiff had some reduction of sensation over the mental division over the right mandibular nerve which is at the point of the chin on the right side. He was of the opinion that the laceration to plaintiff’s left frontal region severed the first branch or supraorbi-tal branch of the trigeminal nerve on the left. He was of the further opinion that the fracture of the mandible, impaired the mandibular component, or the mental branch. He testified that it would probably take twelve to fourteen months for the supraorbital branch of the trigeminal nerve to regenerate itself if no problems developed with scar tissue. During the time of its regeneration, a person suffering with such injury can have peculiar feelings, par-asthesias, pain, burning, or stinging sensation. He felt that the chances were good for the recovery of the right mandible nerve which supplies half of the lower lip and the gums on that side. Because of the damage to the mandibular nerve, plaintiff had sustained a loss of sensation in that particular area for which the healing process would take twelve to fourteen months. There is also a possibility that the nerve will not regenerate in which event further medical attention would be required. Dr. Boykin found no neurological explanation for the complaint of blurred vision but did not rule out possible injury to the eye as that examination would have to be performed by an ophthalmologist. He found that the dizziness and headaches are the usual consequences of a cerebral concussion as suffered by plaintiff. These complaints will normally subside in a period of time which Dr. Boykin thought likely in this case as plaintiff did not have any disturbance of his equilibrium or his co-ordination. Dr. Boykin thought that plaintiff *324 was employable as of January 15, 1974, and able to engage in manual labor from a neurological standpoint. However, he could not say that plaintiff could engage in manual labor without pain as plaintiff would still continue to have headaches which would not necessarily be affected by work. He stated that plaintiff had the physical attributes, the ability to return to work. But he could not say that when plaintiff returns to work he would not still have some headaches or still some complaints of dizziness.
“Dr. Fred Willis, a general practitioner of Coushatta, Louisiana, saw plaintiff on several occasions, the first of which was on January 30, 1974. He stated that at the time of his first examination, plaintiff complained of shoulder pain, severe back pain, stiffness of his shoulder, which limited his activity, as far as his range of motion and function of his right arm. After examination, Dr. Willis found that the right shoulder had a decreased range of motion, and there was a moderate amount of muscle spasm in the back with no tenderness. He also found ‘chronic decreased straight leg raising and decreased range of motion of his trunk and lumbo sacral spine.’ He prescribed analgesics and a muscle relaxant at that time. He later saw plaintiff on February 8, 1974, at which time his condition was basically unchanged. From the statement attached to his deposition, it appears that Dr. Willis saw plaintiff on fourteen different occasions between January 30, 1974, and July 10, 1974. After the visit of February 18, 1974, Dr. Willis concluded that plaintiff had a chronic lumbo-sacral type of injury, which would be persistent as far as his activity was concerned, as well as limited range of motion of his right shoulder which was secondary to his injury. As a result of these examinations and treatment, Dr. Willis was of the opinion that plaintiff was unable to perform heavy duty or manual labor continuously from the time of the first visit in January until the last time that he saw him.
“At the time of the first examination on January 30, 1974, Dr. Willis referred plaintiff to Dr. W. S. Bundrick, an orthopedic surgeon in Shreveport, Louisiana. Dr. Bundrick examined plaintiff on February 1, 1974. Contrary to the findings of Dr. Willis, Dr. Bundrick .found that plaintiff had full range of motion in the right shoulder although he had some pain at full abduction and external rotation. Dr. Bun-drick further found that he had some tenderness along the anterior axillary line along the eighth rib and some tenderness in the paraspinous muscles together with minimal tenderness about the iliolumbar ligaments in the back on both the right and left sides. Dr. Bundrick did not detect any muscle spasm or tightness present on this examination. He further found that straight leg raising tests produced pain at ninety degrees bilaterally in the supine position but did not produce pain when the patient was in a sitting position. He further found some tenderness over the lateral or outer aspect of the left thigh but no soft tissue swelling. He also found minimal tenderness over the outer aspect of the knee. The only abnormality shown by x-rays taken by Dr. Bundrick was a healing fracture to the neck of the scapula and a residual epiphysitis of the fourth lumbar vertebra, to which he attached no special significance. Dr. Bundrick’s impression was a healing fracture of the right scapula, a healing fracture of the left eighth rib, resolving contusion of the left thigh, lum-brosacral myoligamentous strain and no evidence of a herniated disc. He stated that he thought plaintiff was improving at the time of the examination, that some of his back pain was due to decreased tone in the back and abdominal muscles and this was the reason he put him on some exercises.
“Dr. Bundrick stated that plaintiff would probably have some pain with work which required excessive bending and stooping. But as far as the mild lumbrosacral sprain, he could attempt it. He thought that plaintiff would have pain upon repeated bending and, therefore, recommended a course *325 of Williams exercises to strengthen his hack and abdominal muscles. Dr. Bun-drick further stated:
“ ‘I believe at this time he could have returned, I don’t say that he would be pain free, without some aching in his back, or whether this would prevent him from doing his work. I couldn’t definitely say that.’
“On cross examination, Dr. Bundrick was asked the following question:
“ ‘Q. Then it is a fair statement to say that when you saw him, on February 1, you felt that he could work, but naturally, with some discomfort, you felt that if he went on the program of exercises recommended by you, that some three or four months after that he would work without significant discomfort?’
“Dr. Bundrick answered:
“ ‘A. Yes, I would think so.’
“At the time of the accident, plaintiff was employed by Mr. H. G. Quinn in a seismograph crew. Mr. Quinn testified that plaintiff worked the jugline while employed by him. To perform his duties, plaintiff was required to carry the phone cable weighing 56 pounds and the geo-phones referred to as ‘jugs’, and wire which weighed 8 pounds. Lay witnesses produced by plaintiff testified that plaintiff’s back became stiff and painful after prolonged sitting, his pain and complaints increased after bending, stooping or attempting to lift objects, that he had attempted to perform pulpwood work on one occasion since the accident and was unable to, and also had attempted to assist his wife in running a paper route in an automobile but was unable to continue.
“Plaintiff has filed a tort suit against Eugene Freeman and others as a result of the accident herein sued upon. Mr. Ernest Freeman, the father of Eugene Freeman, testified that he had talked to plaintiff about hauling wood for him to which plaintiff had answered that he would have to slip around to do it. Mrs. Patricia Freeman, the wife of Eugene Freeman, testified that she had seen plaintiff dancing in the night spots in this area. She described the dancing done by plaintiff as including moving, bending, twisting and moving the arms a good bit, during which plaintiff gave no appearance of pain. Mr. Eugene Freeman testified that he had seen plaintiff dance on several occasions, doing the twist and other new dances which required bending and moving of the arms during which occasion plaintiff gave no appearance of pain.
“Just prior to the trial of this case and after the taking of the deposition of Dr. Bundrick, Dr. Bundrick saw plaintiff again on June 11, 1974. His report of this examination was filed into evidence in lieu of his testimony. In that report, Dr. Bun-drick gave his impression that followed his examination of Mr. Maines on June 11, 1974 as ‘lumbosacral strain, no evidence of nerve root irritation or herniated lumbar disc.’ Dr. Bundrick stated ‘this patient may have difficulty performing work which requires heavy lifting or excessive bending or stooping of the lower back. However, at the present time all the findings are subjective. He might improve with a back support which is what I would recommend at this time. He is to see you for continued treatment.’
“The evidence in this case clearly establishes that Mr. Maines was required to perform heavy labor, including the carrying of approximately sixty pounds of weight and at times over rough terrain. Dr. Buerlot was of the opinion on December 17, 1973, that it would take plaintiff an additional four to six weeks with a full exercise program to be able to return performing the same duties of this employment without substantial pain. He did not discharge plaintiff and requested that he return for another examination which plaintiff failed to do. Dr. Bundrick as a result of his initial examination on February 1, 1974, felt that strenuous labor, involving *326 stooping and bending, would cause discomfort and, therefore, recommended a program of exercises. He was of the opinion that with that program of exercises, it. would take three or four months before plaintiff could work without significant discomfort. Dr. Willis was of the opinion that plaintiff was unable to perform heavy manual labor on any of the occasions when he saw plaintiff. Dr. John T. Mosley, the original treating physician, was of the opinion that plaintiff was able to return to work at the time of his discharge on January 11, 1974. The Court concludes that the preponderance of the evidence establishes that plaintiff was disabled in January, 1974, at which time compensátion benefits were discontinued. The medical evidence establishes that a return to heavy physical labor at that time would have caused substantial discomfort and pain to plaintiff. As the last examinations of Dr. Willis and Dr. Bundrick indicate that he remains unable to perform heavy manual labor without significant discomfort, he is entitled to workmen’s compensation benefits for total permanent disability for the duration of his disability, not to exceed the maximum length of the time set by law.”
Appellants urge on appeal that it is inconceivable, considering the alleged severity of pain which Maines was suffering, that he would be able to perform such strenuous physical activities as dancing, sitting in a metal boat for three or four hours, and' deer hunting and yet insist he is totally and permanently disabled. These types of recreational activities in no way compare with the strenuous physical exertion plaintiff encountered in his job which consisted of lifting and carrying weights of 60 pounds or more over rough terrain for an entire working day. Thus, there is no contradiction in plaintiff’s ability to engage in light physical activity as compared with his inability to perform the heavy manual labor required by his job.
For the reasons assigned, the judgment of the lower court is affirmed at appellants’ cost.